[Crim. No. 3150.   Second Appellate District, Division Two.—October 2, 1939.]

THE PEOPLE, Respondent, v. L. W. ANDERSON et al., Defendants; J. L. HARPER, Appellant.

Harry T. Young for Appellant.

Earl Warren, Attorney-General, and Warner I. Praul, Deputy Attorney-General, for Respondent.

WOOD, J.—The defendants, Anderson, Barricklow and Harper, were jointly charged in an indictment containing forty counts with the crimes of violation of the Corporate Securities Act and of grand theft. Defendant Barricklow fled and was not apprehended. Defendants Anderson and Harper were convicted on various counts charging both offenses. Defendant Harper prosecutes this appeal from the judgments and from the order denying his motion for a new trial.

Appellant contends that, even if it be conceded that Anderson and Barricklow are guilty of grand theft, the evidence is insufficient to show his complicity in their criminal transactions. Defendants Anderson and Barricklow were in personal control of an office in the city of Long Beach, which they used as headquarters for making agreements with various persons for the sale of ore to be shipped from mines in San Bernardino County and in the State of Arizona to a smelting company in Salt Lake City. The following is typical of the agreements signed, each of which is entitled, "Bill of Sale": "Know All Men By These Presents: That the Star of Cima Mines, party of the first part, for and in consideration of the sum of One Hundred twenty five dollars ($125.00) legal tender of the United States of America, to me in hand paid by Nettie A. Barton, party of the second

part, the receipt whereof is hereby acknowledged, do by these presents sell unto the said party of the second part, his executors, administrators and assigns, Fifty (50) tons of ore at the Star of Cima Mines, said ore to be shipped to the American Smelter and Refining Company at Salt Lake City, Utah, within Ninety (90) days from date. It is agreed that the Star of Cima Mines will remit direct to the said Nettie A. Barton the sum of Two Hundred fifty dollars ($250.00). It Is Further Agreed that should the shipment not be sufficient to bring a net return of the required ($250.00) the party of the first part agrees to make a further shipment immediately to cover the deficit. Unavoidable Delays. It is further agreed that the obligations imposed upon the first party may be suspended by the elements, accidents, strikes, lockouts, riots, delays in transportation, or interference by State or Federal action, or causes beyond the control of the first party. Dated this 1 day of December 1934 Witness: (Signed) Georgene Williams (Signed) L. W. Anderson Party of the first part Star of Cima Mines (Signed) Nettie A. Barton Party of the second part''. In two of the counts Anderson was named in the bills of sale as first party and the ore was designated as being ''at the J and J and Klondyke Mines near the Colorado River, Mojave County, Arizona.''

No ore was ever mined or shipped and defendants did not have any facilities for mining or shipping the ore. No mine was in existence bearing the name ''Star of Cima''. The evidence is overwhelming that Anderson and Barricklow were defrauding the parties with whom the contracts were made and that they were guilty of grand theft in making false representations to prospective purchasers that the ore was available for shipment and was being shipped and that other people had actually doubled their money in similar transactions.

The evidence is sufficient to establish the guilty complicity of appellant in the operations of Anderson and Barricklow. Under date of November 19, 1934 appellant and Anderson signed an instrument concerning the purchase of ore which is as follows: ''Know All Men By These Presents: That, whereas, the undersigned, party of the first part, is the owner by location of the Arizona Belle or Tres Hombres Malos group of mining claims in the Klondyke district, Mo-

have county, Arizona, and by lease and bond of the Jim and Jerry group of mining claims in the same district, county and state, and which said two groups of mining claims contain developed, partly developed, and, in place, a large tonnage of commercial gold ore; and the said party, and his associates, are desirous of developing, mining, extracting, milling and shipping and smelting ore from the said premises, and to that end are in need of funds; and Whereas, the party of the second part, agrees that he is in position, through his resources and resources of certain friends and associates, among them Mr. A. Barricklow, to provide certain funds for the purposes named, and that he will engage to do so provided security be given in the form of a bill of sale of a tonnage of commercial-grade ore sufficient, after all costs of developing, mining, trucking, milling or smelting, and royalty, if any, have been deducted, to yield at least double the amount of purchase price, to provide the said funds as and when needed, it being expressly understood that the said funds are for the purpose of creating mine production and the further purpose of providing milling facilities on the ground. Now, therefore, the party of the first part, for and in consideration of the sum of One Dollar, in hand paid him by the party of the second part, and other valuable considerations, does hereby sell, convey and set over unto the party of the second part, and through him to his associates, five thousand (5000) tons of said commercial ore, and an option for five thousand tons additional, at the price of $2.00 per ton, against the purchase price of which the party of the second part agrees to make certain payments per week or month in a manner best to serve the developing and operating needs of the party of the first part; and that the party of the first part will mine and deliver or cause to be mined and delivered to the order of the party of the second part, such part or all of the above-named tonnage as can be so mined and delivered with the facilities provided, and as can be shipped and smelted, or milled at commercial or leased plants, or treated on the ground, it being understood that the party of the first part will do his utmost in this connection consistent with the means provided but that this obligation shall not prevail as against impracticable or impossible marketing conditions, until our own mill is installed, or against contingencies commonly ascribed to acts of God.'' Appellant testified that to

carry out the terms of this agreement would involve him in a loss of approximately $110,000. His only explanation was that he needed the money for operation and considered it good business in the long run.

Appellant's direct connection with the activities of Anderson was otherwise shown by a number of witnesses. J. B. Mighton testified that he was the owner of a mine known as the "Morning Star Mine" in the vicinity of Cima and that in the year 1934, the month not being remembered, appellant and defendant Anderson and one Truax examined his mining property and took samples, but the witness did not give any of them a contract by which they were entitled to operate the property. In answer to the question, "Now do you know when the name 'Star of Cima' was decided upon?" the appellant, while making a statement concerning his contracts, answered, "No, that was Mr. Anderson, he decided upon that, to use that as what I considered at the time, for a covering term for our contracts. I never understood that he assumed it had any direct connection with the Arizona or California property." The letterheads in the Long Beach office carried the names of Anderson, Barricklow and Harper in type of equal size above the words in larger type, "Star of Cima Mines".

Appellant owned no property in the Cima district and his only interest in Arizona property was by way of a so-called "bond and lease" permitting him to operate certain mining property but in which he was in default on his payments to the owners. Appellant claimed to be in need of money to operate the Arizona mine and had no ore ready for shipment or means for mining or shipping ore. According to his statement he depended upon Anderson and Barricklow to provide him the means for mining and shipping the ore but the means adopted turned out to be the fraudulent agreements which they made with their victims in Long Beach, agreements in which by the jury's implied finding, appellant had guilty participation. Appellant was in frequent communication with Anderson by wire and letter. On September 30, 1934, he wrote Anderson as follows: "Dear Mr. Anderson: Responding as to the probable outlook during the month of October, it will be within the capacity of our operations to have say 21 cars during that period. Endeavor

will be made to steadiness in output so all commitments made or planned in connection therewith will be promptly met. Sincerely yours, J. L. Harper.'' Some of the witnesses testified that they had seen communications to Anderson over the signature of appellant. Since appellant had no facilities for mining and shipping the ore it is reasonable to conclude that fraudulent communications were sent by appellant for the purpose of aiding Anderson and Barricklow in duping the public.

That appellant was informed concerning the type of contract being made with the public by Anderson could readily be inferred from his own testimony in which he admitted a number of his activities set forth herein. He also admitted that he had signed in blank and given to Mr. Truax for the purpose of raising money instruments similar in form to those being used by Anderson. These instruments were as follows: ''Know All Men By These Presents: That (blank), party of the first part, for and in consideration of the sum of (blank) dollars, legal tender of the United States of America, in hand paid by (blank), party of the second part, the receipt whereof is hereby acknowledged, does by these presents sell unto the said party of the second part, his executors, administrators and assigns (blank) tons of ore at the Arizona Belle, Tres Hombres Malos Mines, near the Colorado River, Mojave County, Arizona. Said ore to be shipped to a custom smelter or mill where the best treatment rate is procured, within (blank) days from date hereof. The smelter or mill to remit directly to the said (blank) the sum of (blank) dollars. It is further agreed that should the shipment not be sufficient to bring a net return of the expected sum, the party of the first part will make a further shipment required to cover the deficit. Unavoidable delays: It is further agreed that the obligations imposed upon the first party as to manner or time of shipment may be suspended by the elements of accidents, strikes, lockouts, riots, delays in transportation, embargoes, or interference by State or Federal action, or other causes beyond control of parties of first part. Dated this 18th day of December, 1934.'' Several of these instruments were used and the blank spaces filled out in such manner that the purchasers were guaranteed a return of double the purchase price.

Appellant signed a "Memorandum of Co-Partnership" before a notary and caused it to be recorded in the office of the county recorder of San Bernardino County, in the following language: "Memo of Co-Partnership, This Is To Certify; that the mine development and mining operations carried on under the name 'J. L. Harper, Managers' in San Bernardino County, California, in the Cima and other districts and in the Klondyke district, of Mohave County, Arizona, is by and for a Co-partnership, composed of J. L. Harper, of Los Angeles, California and his associates: and L. W. Anderson, of Long Beach, California; and his associates; and that the said Co-partnership is for the purpose of examining, optioning, leasing, purchasing, and operating Metal Mines, etc., and that the said Co-partnership is later to be resolved to a Trust Estate or a corporate entity, at which time the respective interests of all concerned will appear in Trust Estate Certificates or Corporate Shares; that the mine control and operations are in the hands of J. L. Harper and the financial matters in the hands and under the direction of L. W. Anderson. Dated this 16th day of September, 1934. (Signed) J. L. Harper."

There is no merit in appellant's contention that the evidence fails to show appellant's guilty connection with the fraud. The jury was justified in finding that he conspired with and aided and abetted the other defendants.

Appellant contends that the court erred in admitting evidence to prove a conspiracy and in giving to the jury a number of instructions on the subject of conspiracy. The fact that conspiracy was not pleaded in the indictment did not prevent proof by the prosecution of the existence of a conspiracy and it was proper to instruct the jury after such proof concerning the law applicable. (*People* v. *Tanner*, 3 Cal. (2d) 279, 299 [44 Pac. (2d) 324].) It is elementary that the acts and declarations of co-conspirators in furtherance of the object of the conspiracy are admissible in evidence as against all the conspirators.

In his application for a rehearing appellant makes the point that the trial court erred in admitting in evidence the statements of defendant L. W. Anderson made to the district attorney at the time of his arrest. There is no merit in this contention. A search of the record reveals

that at the time the statement of Anderson was received in evidence it was admitted as against Anderson only. In disposing of appellant's objection the trial court stated: "The statement of Mr. Harper will be received merely for the purpose of binding Mr. Harper, and not as being binding on Mr. Anderson. And the same with the statements of Anderson, not in the presence of Harper, it will be received merely for the purpose of binding Anderson and not Harper." Moreover, it appears that Anderson while a witness at the trial made substantially the same statements as those contained in his statement to the district attorney.

Appellant makes several other criticisms concerning the admission of testimony and concerning the instructions to the jury. All of the points advanced have been directly passed upon adversely to his contentions or they are of so little importance as to make discussion inappropriate.

A serious question is presented, however, by the contention of appellant that the evidence admitted fails to establish a violation of the Corporate Securities Act. It is conceded that no permit was obtained from the commissioner of corporations but it is argued that no permit was necessary. The prosecution argues that the instruments signed by Anderson and the various residents of Long Beach, which are termed bills of sale, are in fact *securities* as defined by subdivision 7 of section 2 of the Corporate Securities Act, which reads as follows: "7. Security. The word 'security' shall include any stock, bond, note, treasury stock, debenture, evidence of indebtedness, certificate of interest or participation, certificate of interest in a profit-sharing agreement, certificate of interest in an oil, gas or mining title or lease, collateral trust certificate, any transferable share, investment, contract, or beneficial interest in title to property profits or earnings, guarantee of a security and any certificate of deposit for a security." It is apparent that defendants did not sell a "beneficial interest in title to property, profits, or earnings", since the instruments show a direct sale of a definite number of tons of ore located at a designated mine. The fact that defendants guaranteed a return of double the purchase price of the ore does not change the nature of the instrument. The prosecution cites *People* v. *White,* 124 Cal. App. 548 [12 Pac. (2d) 1078], *People* v. *Claggett,* 130 Cal. App. 141

[19 Pac. (2d) 805], *People* v. *Coyle*, 134 Cal. App. 612, 613 [25 Pac. (2d) 991], *Domestic & Foreign Pet. Co., Ltd.,* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73], and *People* v. *Jackson,* 24 Cal. App. (2d) 182 [74 Pac. (2d) 1085]. In all of these cases, however, the parties obtained instruments showing that an interest only had been obtained in the property being sold or that the transactions evidenced an investment in the concerns operated by the defendants. In the case now before us the parties purchased the ore outright and made no investment in the business conducted by defendants. A purchase and sale agreement covering a designated commodity is not a security under the common understanding of the term or by the definition in the Corporate Securities Act. Since it was not necessary for defendants to obtain a permit from the commissioner of corporations to sell the ore referred to in the indictment, the convictions charging violation of the Corporate Securities Act cannot be sustained.

The judgments and order denying a new trial in respect to the counts charging grand theft, counts III, IV, VII, IX, XII, XXIX, XXXIV, XXXVII, XXXIX, and XXXX are affirmed. The judgments and order denying a new trial with respect to the counts charging violation of the Corporate Securities Act, counts, I, II, V, VI, VIII, X, XI, XIII, XVI, XVII, XVIII, XX, XXI, XXII, XXIV, XXV, XXX, XXXI, XXXII, XXXIII, XXXV, XXXVI, and XXXVIII, are reversed.

MOORE, P. J., Concurring.—I concur. The testimony of the defendant Anderson, an accomplice, tells the tale of a sordid conspiracy of two life-long friends, formerly united by family ties. Both, without funds, decided upon procuring by some means a mine of some sort to use as a basis for the sale of something to get money. Their working together resulted in appellant's lease of the Arizona property. It is not necessary that the conviction of appellant should have been founded upon the testimony of witnesses other than that of his accomplice. It is sufficient that evidence outside of his confederate's story tend to connect defendants with the commission of the crime. (*People* v. *Cloonan,* 50 Cal. 449; *People* v. *Zimmerman,* 65 Cal. 307 [4 Pac. 20]; *People* v.

*McLean,* 84 Cal. 480, 482 [24 Pac. 32]; *People* v. *Davis,* 135 Cal. 162 [67 Pac. 59]; *People* v. *Watson,* 21 Cal. App. 692 [132 Pac. 836].)

The witness Heldt saw telegrams from appellant stating that a number of tons of ore were available. Appellant admitted that, from time to time, he was expected to ship so many car loads or tons at a certain period; that he knew of the form of contract used by his codefendants in making sales; that he had signed in blank and given such a form to the witness Truax for the purpose of raising money after the same fashion; that said form was identical with that used by Anderson and Barricklow in their sale to Schadandorf; that he learned of the sales of ore by his confederates from several sources; that he wired Anderson that he expected to ''ship so many car loads or tons within a certain period'', and that he knew that Anderson and Barricklow were carrying on ''a movement satisfactory to the Securities Commission on selling ore tonnage''.

Appellant's letter to Anderson, in the early days of the enterprise, stating that he would be able to get out ''twenty-one cars'' during the month of October, and of his purpose to make the output steady ''so all commitments made or planned in connection therewith will be promptly met'', was a potent factor in the proof of his complicity in Anderson's sales of ore. Also, after Anderson, in his anxiety, sought assistance of appellant in improving the form of the bill of sale, appellant procured advice and an improved form, and forwarded it to Anderson with the statement that it was ''bullet proof''. Moreover, appellant entered into contracts like those used by Anderson and Barricklow while ''he had no facilities for fulfilling them''.

Although appellant sent money to take up the contracts sold by his codefendants, no ore was ever mined or shipped. None was ever milled. Equipment for mining and transportation was so insignificant as to make it unworthy of mention.

Having knowledge of the sales campaign carried on by his codefendants, knowing that only by his work and by the properties under his control were the fulfillment of those contracts possible, and that he had no satisfactory facilities for mining or transporting or milling,—these facts being estab-

lished outside of the testimony of his confederates, nothing more is required to establish the reasonableness of the inference drawn by the jury.

McCOMB, J., Concurring and Dissenting.—I concur in the judgment reversing counts I, II, V, VI, VIII, X, XI, XIII, XVI, XVII, XVIII, XX, XXI, XXII, XXIV, XXV, XXX, XXXI, XXXII, XXXIII, XXXV, XXXVI, and XXXVIII. I dissent from the judgment affirming the conviction on counts III, IV, VII, IX, XII, XXIX, XXXIV, XXXVII, XXXIX, and XXXX.

Viewing the evidence most favorable to respondent, the essential facts are:

On November 19, 1934, appellant entered into an agreement to sell defendant Anderson 5000 tons of gold bearing ore at the price of $2 per ton. He received on account of this contract $3,400. Thereafter defendants Anderson and Barricklow, without first obtaining a permit from the corporation commissioner, entered into agreements with a number of persons, of which the following is typical:

### "BILL OF SALE

"KNOW ALL MEN BY THESE PRESENTS:

"That the STAR OF CIMA MINES, a party of the first part, for and in consideration of the sum of One Hundred twenty five dollars ($125.00) legal tender of the United States of America, to me in hand paid by Nettie A. Barton, party of the second part, the receipt whereof is hereby acknowledged, do by these presents sell unto the said party of the second part, his executors, administrators and assigns, Fifty (50) tons of ore at the STAR OF CIMA MINES, said ore to be shipped to the American Smelter and Refining Company at Salt Lake City, Utah, within Ninety (90) days from date. It is agreed that the STAR OF CIMA MINES will remit direct to the said Nettie A. Barton the sum of Two hundred fifty dollars ($250).

"IT IS FURTHER AGREED that should the shipment not be sufficient to bring a net return of the required ($250.-00) the party of the first part agrees to make a further shipment immediately to cover the deficit.

"Unavoidable Delays. It is further agreed that the obligations imposed upon the first party may be suspended

by the elements, accidents, strikes, lockouts, riots, delays in transportation, or interference by State or Federal action, or causes beyond the control of the first party.

"Dated this *1* day of December, 1934

" (Signed) *L. W. ANDERSON*
Party of the first part
STAR OF CIMA MINES
(Signed) *NETTIE A. BARTON*
Party of the second part

Witness:
(Signed)
*GEORGENE WILLIAMS*
Received payment in full
_____"

These two defendants represented to the parties with whom they were dealing that they would double their money by entering into the transactions. In each instance charged in the indictment, not only did the parties dealing with defendants Anderson and Barricklow not receive double their money, but neither their investment nor any portion thereof was returned to them.

Appellant relies for reversal of the judgment on this proposition:

*There is no substantial evidence to sustain the implied findings of fact of the jury upon which the judgments against him were necessarily predicated, to wit, that he had conspired with his codefendants to commit the various violations of the Corporate Securities Act and grand thefts charged in the indictment.*

This proposition is tenable. An examination of the record fails to disclose any evidence that appellant had knowledge of or participated in any way in the various transactions which took place between his codefendants and the complaining witnesses. The only evidence connecting appellant in any way with the transactions was that he entered into the agreement of November 19, 1934, with defendant Anderson mentioned above and that on several occasions he telegraphed his codefendants that certain quantities of ore had been mined by him, and on September 30, 1934, wrote defendant Anderson the following letter:

"Dear Mr. Anderson:

"Responding as to the probable outlook during the month of October, it will be within the capacity of our operations to have say 21 cars during that period. Endeavor will be made to steadiness in output so all commitments made or planned in connection therewith will be promptly met.

"Sincerely yours,
"J. L. HARPER."

It thus appears that the record is devoid of any evidence even slight which connects or tends to connect appellant with any of the crimes of which he was convicted.

For the foregoing reasons the judgments appealed from should in my opinion be reversed and a new trial granted.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 1, 1939. Edmonds, J., and Carter, J., voted for a hearing.