[No. F007881. Fifth Dist. Aug. 26, 1987.]

WILLIAM MORELAND, Plaintiff and Appellant, v.
DEPARTMENT OF CORPORATIONS, Defendant and Respondent.

508

**COUNSEL**

E. C. LeLouis and Michael Lynn Gabriel for Plaintiff and Appellant.

George A. Crawford and Elisa B. Wolfe for Defendant and Respondent.

Joseph C. Long as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

REID, J.*—On April 4, 1986, the Department of Corporations, respondent, issued a desist and refrain order pursuant to Corporations Code[1] section 25532[2] alleging William Moreland, appellant, offered securities to the public without complying with various provisions in the Corporate Securities Law of 1968. (§ 25000 et seq.) Soon thereafter, appellant request-

---

* Assigned by the Chairperson of the Judicial Council.

[1] All statutory references are to the Corporations Code unless otherwise indicated.

[2] Section 25532 provides: "(a) If, in the opinion of the commissioner, the sale of any security is subject to qualification under this law and it is being or has been offered or sold without first being qualified, the commissioner may order the issuer or offeror of such security to desist and refrain from the further offer or sale of such security unless and until qualification has been made under this law.

"(b) If in the opinion of the commissioner any person is acting as a broker-dealer or investment adviser in violation of Section 25210 or 25230, the commissioner may order such person to desist and refrain from such activity unless and until the person has been licensed as such under this law.

"(c) If, after an order has been made under subdivision (a) or (b), a request for hearing is filed in writing within one year of the date of service of the order by the person to whom the order was directed, a hearing shall be held in accordance with the Administrative Procedure Act, Chapter 5 (commencing with Section 11500) of Part I of Division 3 of Title 2 of the Government Code, and the commissioner shall have all of the powers granted under that chapter. Unless the hearing is commenced within 15 business days after the request is filed (or the person affected consents to a later date), such order is rescinded.

"If that person fails to file a written request for a hearing within one year from the date of service of the order, the order shall be deemed a final order of the commissioner and shall not be subject to review by any court or agency, notwithstanding Section 25609."

ed an administrative hearing on the order, which ultimately was held on April 25, 1986. Just prior to the hearing, the parties entered into a stipulation wherein it was agreed the sole issue to be resolved at the hearing was whether the investments were securities within the meaning of the Corporate Securities Law.

The administrative law judge issued a proposed decision on May 27, 1986, concluding the investments were "securities," thereby upholding the desist and refrain order. Respondent formally adopted this proposed decision as its own decision on May 29, 1986.

On July 24, 1986, appellant filed a petition for writ of mandate in the Kern County Superior Court seeking a review of this decision. After conducting an independent review of the administrative record, the trial court denied this petition on October 24, 1986. This appeal followed.

FACTS

The transaction which is the focus of this case involves the sale and refining of gold ore. Appellant, through his company, Moreland Industries (Moreland), offered investors the opportunity to purchase gold ore. According to the agreement, investors could purchase ore from Moreland, with a gold content of .15 ounces per ton, for $37.50 per ton. The "sales contract" further provided: "The gold ore is located on the Moreland property on Piute Mountain at and around the Lone Star Mine located in Kern County, California, Section 18, Township 28 South, Range 34 East, MDM. The ore is in stockpiles ready for shipment. The second party may remove his ore at his own cost.

"The first party will mill the ore and deliver the gold to the second party based on the Sales Contract date. The ore will be milled on a first come basis at the rate of 150 tons per day. The total tonage [sic] to be sold is 110,000 tons of ore."

Purchasers of the ore could then enter into a second agreement where Moreland would refine the ore: "MORELAND INDUSTRIES will refine __ tons of ore, __ troy oz. gold, and deliver the gold to a reputable company for hallmarking and certifying the gold purity.

"Time of delivery to the hallmarking company will be within 25 days after the ore has been refined.

"The owner will be advised of the name and address of the hallmarking company and the date by which the gold will be available. The owner will

pick up his refined and hallmarked gold from the hallmarking company or make other arrangements for delivery.

"The owner will receive a copy of the contract with the hallmarking company entered into by MORELAND INDUSTRIES . On the contract there will be the amount of gold the owner is to receive. The owner will present his copy of the contract and identification to the hallmarking company."

Once the purchaser entered into both the sales and refining contracts, appellant offered to guarantee his performance under the contracts through a third agreement.

"Guarantor hereby guarantees to Buyer that should the Seller fail to complete or fully perform his contract dated __ with Buyer, that the Guarantor will reimburse the Buyer for the unfulfilled Sales Contract price paid by the Buyer in accordance with the Moreland Irrevocable Gold Trust Agreement." This guaranty was secured by various mining claims owned by appellant. In the event of a total default, the purchasers of the ore would be reimbursed out of funds generated from the sale of these claims.

It is this set of agreements, individually and as a group, respondent believes constitute securities and violate the Corporate Securities Law.

## DISCUSSION

The sole question to be resolved is whether the series of agreements, into which appellant proposed to enter with members of the public, constituted securities within the meaning of section 25019. ■ Since the trial court applied the "independent judgment" test in reviewing the evidence presented by the administrative record, our function is simply to decide whether credible and competent evidence supports the trial court's judgment. (*Dresser* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 506, 510-511 [181 Cal.Rptr. 797]; *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 71-72 [64 Cal.Rptr. 785, 435 P.2d 553].) All conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged to uphold the trial court's conclusions. (*Dresser* v. *Board of Medical Quality Assurance, supra,* 130 Cal.App.3d at p. 511.)

Section 25019 provides in relevant part: " 'Security' means any note; stock; . . . *investment contract*; . . . ; or any certificate of interest or participation in, temporary or interim certificate for, receipt, for *guarantee of,* or warrant or right to subscribe to or purchase, *any of the foregoing.* All of the foregoing are securities whether or not evidenced by a written document. . . ." (Italics added.)

■ What constitutes a security is a question of fact to be decided on a case-by-case basis. (*People* v. *Figueroa* (1986) 41 Cal.3d 714, 733-734 [224 Cal.Rptr. 719, 715 P.2d 680].) In so doing, section 25019 is not read or applied literally. Instead, the determination of whether an instrument is a security is made only after reviewing the facts and circumstances surrounding the transactions and considering the regulatory purpose of the Corporate Securities Law. (*Leyva* v. *Superior Court* (1985) 164 Cal.App.3d 462, 470 [210 Cal.Rptr. 545].) The purpose of the law is "to protect the public against spurious schemes, however ingeniously devised, to attract risk capital." (*Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R.2d 1135].)

In *Figueroa*, the Supreme Court summarized the various cases where transactions were found to be securities and noted: "These cases underscore the fact that the corporate securities laws do not contain an 'all-inclusive formula by which to test the facts in every case. And the courts have refrained from attempting to formulate such a test. Whether a particular instrument is to be considered a security within the meaning of the statute is a question to be determined in each case. In arriving at a determination the courts have been mindful that the general purpose of the law is to protect the public against the imposition of unsubstantial, unlawful and fraudulent stock and investment schemes and the securities based thereon.'" (41 Cal.3d at p. 736.) Again, the substance of the transaction rather than its form governs whether a transaction will be considered a "security." (*Id.* at p. 734.)

The California Corporate Securities Law was patterned after the federal Securities Act of 1933. (*People* v. *Schock* (1984) 152 Cal.App.3d 379, 387 [199 Cal.Rptr. 327].) Section 25019 is derived from section 2(1) of the act (15 U.S.C.A. § 77b), section 401(1) of the Uniform Securities Act, and section 25008 of the previous Corporate Securities Law. (1A Marsh and Volk, Practice Under the Corporate Securities Law (1986) pp. A-1-89–A-1-90.3.) ■ When legislation has been judicially construed, a subsequent statute on the same subject, using the same language, is generally given a similar interpretation. (*Los Angeles Met. Transit Authority* v. *Brotherhood of Railroad Trainmen* (1960) 54 Cal.2d 684, 688 [8 Cal.Rptr. 1, 355 P.2d 905], overruled on other grounds in *County Sanitation Dist. No. 2.* v. *Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 592 [214 Cal.Rptr. 424, 699 P.2d 835].) Furthermore, it is a basic premise of statutory construction that when a state law is patterned after a federal law, the two are construed together. (See Sutherland, Statutory Construction (4th ed. 1984) § 57.06.) In these situations, the federal cases interpreting the federal law offer *persuasive* rather than controlling authority in construing the state law. (See *Kaplan's Fruit & Produce Co.* v. *Superior Court* (1979) 26 Cal.3d 60, 65

[160 Cal.Rptr. 745, 603 P.2d 1341]; *Solano County Employees' Assn.* v. *County of Solano* (1982) 136 Cal.App.3d 256, 259-260 [186 Cal.Rptr. 147].)

In making the determination whether an investment is a security in the form of an "investment contract," California appellate courts have set forth two separate and distinct tests. The first such test is the "risk capital" test articulated in *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d 811, 815; the second is the federal or *Howey* test formulated by the United States Supreme Court in *S.E.C.* v. *Howey Co.* (1946) 328 U.S. 293, 298-299 [90 L.Ed. 1244, 1249-1250, 66 S.Ct. 1100, 163 A.L.R. 1043]. ■ Both tests have been applied, either separately or together, by California courts in making the factual determination of whether a particular transaction is a security under section 25019. (See *People* v. *Figueroa, supra,* 41 Cal.3d 714, 736-737, and fn. 28; *People* v. *Coster* (1984) 151 Cal.App.3d 1188, 1193-1195 [199 Cal.Rptr. 253]; *Leyva* v. *Superior Court, supra,* 164 Cal.App.3d 462, 470-471). Accordingly, we too undertake an analysis of the facts before us to determine whether under either test the agreements in this case constitute securities in the form of investment contracts.[3]

■ The federal test of whether a transaction is an investment contract, as set forth in *S.E.C.* v. *Howey Co., supra,* 328 U.S. at page 301 [90 L.Ed. at p. 1251], is "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." In the Ninth Circuit, the term "common enterprise" has been defined as "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties," and the term "solely from the efforts of others" has come to mean "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." (*Securities & Exchange Com'n.* v. *Glenn W. Turner Ent., Inc.* (9th Cir. 1973) 474 F.2d 476, 482, and fn. 7.)

■ There can be no question that members of the public entering into sales of ore and refining contracts with appellant in this case are investing money so as to satisfy the first element of the *Howey* test. The critical questions are whether this investment is in a "common enterprise" and

---

[3] Appellant argues that the California "risk capital" test should be applied to the exclusion of the federal *Howey* test. However, appellant relies extensively upon federal cases applying the *Howey* test in determining what an "investment contract" is and is not. On the other hand, respondent, while arguing for the application of the *Howey* test, recognizes that the "risk capital" test furnishes an independent and equally authoritative basis for making the critical factual and legal determinations. We agree with respondent and believe the approach of the court in *People* v. *Schock, supra,* 152 Cal.App.3d 379, in which a transaction is classified as a "security" if it satisfies either test, is the correct method of analysis.

whether the investors' anticipated profits are to come solely from the essential managerial efforts of appellant.

Respondent relies heavily upon the Ninth Circuit case of *S.E.C.* v. *Goldfield Deep Mines Co. of Nevada* (9th Cir. 1985) 758 F.2d 459 as authority for finding that the present contracts establish a "common enterprise" with investor profits, if any, dependent upon appellant's managerial skills and efforts. This reliance appears to be misplaced.

The essential facts in *Goldfield* are set forth in the court's opinion as follows: "In 1981, Goldfield began soliciting investors to participate in its ore purchase program. Goldfield claimed to have developed revolutionary technology which economically rendered ore dump material into marketable quantities of gold, silver, platinum and palladium. The ore program was structured such that investors were required to purchase a minimum of 18 tons of ore dump material at $500/ton. The ore was to be processed, refined, stored and marketed by Goldfield unless the investor could find an independent mining contractor to provide those services, in which case the investor was required to post a $20,000 bond with Goldfield as 'security.' . . . The purchase required a 15% cash down payment while the remaining balance could be financed with CCF, an organization which later proved to be a nonexistent entity. Goldfield's promotional literature projected a dual benefit from investment in the ore purchase program: the prospect of a 100 percent return on the original cash investment within one to six years, and the availability of significant tax deductions." (*Id.* at pp. 461-462.)

In addressing the issue of whether Goldfield's arrangements with its investors involved a "common enterprise," the court held: "A common enterprise is a venture 'in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties."' [Citations.] It is not necessary that the funds of investors are pooled; what must be shown is that the fortunes of the investors are linked with those of the promoters, thereby establishing the requisite element of vertical commonality. [Citation.] Thus, a common enterprise exists if a direct correlation has been established between success or failure of Goldfield's efforts and success or failure of the investment. [Citation.] "Here, the investors' fortunes were clearly linked with those of appellants. The ore program *required the sharing of profits, in that Goldfield was to receive a 25% royalty fee for processing the investors' ore.* Furthermore, the fortunes of both the investors and appellants were dependent upon the success of appellants' unique ore processing technique. If the processing technique were to prove faulty, then both the investors and appellants would suffer financial losses. This direct correlation between Goldfield's

potential failure and the investors' losses supports a finding of a common enterprise. [Citations.]" (*Id.* at p. 463, italics added.)

Respondent contends that the investment opportunity offered in *Goldfield* is virtually identical to the one in this case. However, even a cursory comparison of the two reveals significant differences. In *Goldfield* the promoters retained control, not only of the processing, refining and storing of the ore, but of the marketing as well. Even more importantly, the promoters were to share in the profits with the investors through the 25 percent royalty fee for processing the ore. This control over the timing and method of marketing and provision for the sharing in profits are totally missing in the present case.

As noted earlier, appellant offered to enter into three separate contracts with investors: a sales contract for the sale of already mined and stockpiled gold ore having a certified assay of .15 ounces of gold per ton; a refining contract whereby appellant undertook to refine and deliver the investors' gold to a reputable company for hallmarking and certifying as to purity; and a security agreement whereby appellant guaranteed the performance of the other two agreements. Those who chose to enter into the sales contract only were under no obligation to utilize appellant's refining or other services but were free to remove their ore at their own expense and deal with it as they chose. However, even those who chose to rely upon appellant's refining and hallmarking facilities retained complete control over the marketing of the refined product, and did not share profits of the enterprise with appellant.

It is respondent's view that it is the combination of the sales and refining contracts that constitutes an "investment contract" within the statutory definition of a security. Notwithstanding, it is important to a complete understanding of the transaction to consider the two agreements separately as well as together.

The sales contract calls for the sale of gold ore for a price of $37.50 per ton. At the assayed content of .15 ounce gold per ton of ore, the price to be paid for the gold content of the ore is $250 per ounce. However, the record supports an assumption that the assayed amount of gold is the minimum gold content of the ore and that there are probably present significant recoverable quantities of gold and other precious metals that add to the ore's gross value. To the investor who takes possession of the raw ore, removes it from appellant's premises and has it refined elsewhere, his true cost for the contract amount of refined gold is $250 per ounce, plus or minus the difference between the additional costs of transporting, milling, refining and hallmarking and the value of precious metals recovered from

the ore in excess of the guaranteed amount of .15 ounce gold per ton. In short, there is a profit to be made, or a loss to be incurred, depending upon the ratio between the cost of producing refined gold and the value of excess quantities of precious metals that may be extracted in the refining process. Where the investor takes possession of his ore and has it refined elsewhere, that profit or loss is his alone and is not shared by appellant.

For those investors who enter into the refining contract as well as the sales agreement, the cost of refined gold is fixed at $250 per ounce, and it is the seller alone who assumes the risk of profit or loss arising out of the refining of the ore with its potential for the recovery of excess precious metals. Under the terms of the sales and refining contracts construed together, the investor is to take delivery of refined gold and not gold ore. The amount of gold to be delivered is the contract amount of .15 ounce per ton of ore purchased and any excess gold or other precious metals recovered is retained by appellant to cover the costs of refining and hallmarking. Once the refining and hallmarking have been completed, the investor takes possession of the gold and any profit thereafter realized is due solely to his efforts and the difference between the market price and his acquisition cost of $250 per ounce.

The foregoing discussion demonstrates clearly that there are fundamental differences between *Goldfield* and the case we have before us. Unlike in *Goldfield,* this case does not involve a sharing of profits through royalties or otherwise, a critical factor in determining whether a common enterprise exists. Moreover, unlike the situation in *Goldfield,* appellant did not retain exclusive control or any control whatsoever over the marketing of the gold so as to make investor profits dependent upon his managerial skills or efforts. And, finally, unlike *Goldfield,* there is nothing in this case to suggest that the refining techniques employed by appellant were unique or experimental so as to introduce a speculative element into the processing itself.

Appellant relies in part upon the Ninth Circuit case of *Noa* v. *Key Futures, Inc.* (9th Cir. 1980) 638 F.2d 77. In *Noa* the defendant offered to sell silver bars pursuant to a contract of purchase, a confirmation and certificate of ownership. These documents provided that defendant would sell and the customer would buy a given quantity of silver that was .999 pure for a given price. Defendant represented it would purchase the silver from a third party and arrange for its refining to the necessary purity. The defendant also agreed to delivery of the silver to the buyer within 30 days after receiving the buyer's payment. As a final aspect of the offer, the defendant agreed to buy back the silver, at any time, at the spot price quoted in the Wall Street Journal. In finding that the contract in this case was not an investment contract, and hence not a security subject to regulation, the court said:

"Once the purchase of silver bars was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of Key Futures. The decision to buy or sell was made by the owner of the silver. [Citations.] . . . . There is a national market for silver which is not dependent upon Key Futures. Thus, although the buy-back agreement here saved the customer a brokerage fee, it does not indicate that the plaintiffs were engaged in a common enterprise with any defendant.

"Plaintiffs admittedly bore the risk that during the thirty day period which defendants had to initiate delivery of the silver, the defendants might become insolvent. From this fact plaintiffs argue that they were engaged in a common enterprise with Key Futures, and that the success of the venture depended primarily on the efforts of those other than investors. We cannot agree. [Citations.] In *Safeway Portland Employees' Federal Credit Union* v. *C.H. Wagner & Co.,* 501 F.2d 1120, 1123 (9th Cir. 1974), this court did mention the continued success and solvency of the defendant as one factor indicating that the investor was involved in a common enterprise with the defendant and that the investor expected profits to come from the efforts of others. But plaintiffs' argument proves too much. The risk they assumed was that which any buyer takes when he pays in advance for goods to be delivered in the future. [Citation.]" (*Id.* at pp. 79-80.)

In seeking to distinguish *Noa* from present circumstances, respondent argues: "The appellant's managerial efforts are also much greater than those of the promoter in *Noa*. Instead of merely purchasing and storing silver, the appellant must safely move, mill, process and refine the investor's raw ore himself and must also arrange for hallmarking and ultimate delivery. The appellant's managerial efforts are obviously the 'undeniably significant ones' 'which affect the failure or success of the enterprise.'"

Respondent's characterization of appellant's activities as "managerial efforts" is subject to serious question. The transportation, milling, refining and hallmarking of the gold are mechanical or manufacturing functions which would not appear to involve the exercise of significant managerial discretion in the use of the investor's money. Moreover, regardless of how competently or successfully appellant performs such functions, the bottom line of his agreement under the refining contract is a contractual commitment to deliver a fixed number of troy ounces of .999 pure gold for $250 an ounce.

The recent Ninth Circuit case of *S.E.C.* v. *Belmont Reid & Co., Inc.* (9th Cir. 1986) 794 F.2d 1388, strongly relied upon by appellant and deemed an aberration by respondent, has clear application to this case. In *Belmont Reid,* Continental Minerals Corporation (CMC), a Nevada corporation that

held partially developed leasehold interests in what were allegedly gold-bearing properties, attempted to raise capital to develop these leases by selling its gold directly to investors. In so doing, CMC proposed to mint two types of gold coin from future gold production and to sell them to investors under either one of two purchase plans. The particular plan, which the S.E.C. claimed was an investment contract subject to securities law regulation, required prepayment of a fixed cash price for a set of gold coins to be minted from gold not yet mined or extracted. In holding that this purchase plan was not an investment contract, the court stated: "This case is a close one. It is clear that the issue before us is whether the transaction in this case meets the third requirement of the *Howey* test—that profits come 'solely' from the efforts of others. As already pointed out, the purchaser's greatest risk under the prepayment plan was the possible failure of CMC to deliver the coins. Any such failure could be the consequence of various misfortunes or breaches of faith of which the failure of the mine to yield sufficient gold would be prominent on any list. Viewed from this angle it is easy to assert that the failure or success of the enterprise in which the prepayment purchaser was engaged depended significantly on the managerial efforts of CMC and for that reason the third requirement of the *Howey* test is met.

"The difficulty we have with this analysis is its ready applicability to any sale-of-goods contract in which the buyer pays in advance of delivery and the ability of the seller to perform is dependent, in part, on both his managerial skill and some good fortune. Perhaps the SEC views such contracts as covered by *Howey*. If so, we must express our doubts.

"As we view it, the prepayment plan purchasers in this case had as their primary purpose to profit from the anticipated increase in the world price of gold. Immediately prior to their purchases such prices had increased rapidly. It was not unreasonable to expect the price to continue to climb. In short, the purchasers were speculating in the world gold market. Admittedly, one can do much the same thing by buying a share in a company mining gold. However, that is not what was done here. To the extent the purchasers relied on the managerial skill of CMC they did so as an ordinary buyer, having advanced the purchase price, relies on an ordinary seller. We therefore agree with the district court that '[p]rofits to the coin buyer depended upon the fluctuations of the gold market, not the managerial efforts of CMC,' . . .; we hold that the profits in this case did not come 'solely' from the efforts of others, and that this transaction was not a security within the meaning of the federal security laws. . . ." (*Id.* at p. 1391.)

It is apparent that the investment contemplated in *Belmont Reid* was at greater risk and depended far more for its success upon the seller's manage-

rial efforts than is true in the present case. Nonetheless, the circuit court looking through form to substance found the transaction to be a sale of a marketable commodity and not an investment contract and cited *Noa* v. *Key Futures, Inc., supra,* 638 F.2d 77, in support of its decision. (And, see, *Sinva, Inc.* v. *Merrill, Lynch, Pierce, Fenner & Smith, Inc.* (S.D.N.Y. 1966) 253 F.Supp. 359, 366-367, holding that contracts to purchase sugar for future delivery are not "investment contracts" because the expected profits come from market fluctuations.) We view the facts of the present case in a similar light. For the reasons previously explained in our analysis of the contracts which are the subject of this action, we find that the circumstances before us fail to establish a "common enterprise" or that investor profits are to come "solely" or even substantially from the efforts of others. We conclude therefore that the contracts in question are not "investment contracts" under the *Howey* test.

 Having concluded that the sales and refining contracts in this case do not constitute an investment contract under the *Howey* test, we turn to a consideration of whether they nonetheless may be deemed such under the "risk capital" test originally articulated by the California Supreme Court in *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d 811. As noted before, respondent has relied primarily upon the *Howey* test and has confined its argument on the proper application of the risk capital test to a single footnote in its brief. Conversely, appellant has contended that the risk capital test is the law of California and should control the disposition of this case. Needless to say, appellant also argues that the contracts under discussion do not constitute securities when the risk capital test is applied properly.

 The "risk capital" test requires a consideration of the following factors: (1) whether funds are being raised for a business venture or enterprise; (2) whether the transaction is offered indiscriminately to the public at large; (3) whether the investors are substantially powerless to effect the success of the enterprise; and (4) whether the investors' money is substantially at risk because it is inadequately secured. (*Leyva* v. *Superior Court, supra,* 164 Cal.App.3d 462, 470.)

 One of the principal cases cited and relied upon by appellant is *Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330 [112 Cal.Rptr. 387]. In *Hamilton,* plaintiff operated a retail jewelry business and implemented a diamond sales promotional plan which the Department of Corporations contended constituted the offer of a "security" within the meaning of section 25019. Pursuant to that plan, and by means of a newspaper advertisement, plaintiff "offered for sale to the general public a selected group of unmounted diamonds ordinarily sold at prices of $500 or more."

(37 Cal.App.3d at p. 332.) The newspaper advertisement by which the offer was made stated: " 'Hamilton Jewelers invites you to invest in a ONE CARAT DIAMOND for only $500, and if anytime [*sic*] within a three year period you elect to return the Stone, Hamilton will return to you the full purchase price *plus 5% interest* calculated daily from the date of purchase. [¶] A diamond investment of $500 will return $578.81 in cash at the end of a three year period.' " (*Ibid,* italics in original.) In concluding that this advertisement did not constitute an offer of a security, the Court of Appeal explained: "The Department contends that Hamilton's public offering, as set forth in its newspaper advertisement, constituted the offer of a security in the form of an 'evidence of indebtedness' or 'investment contract.' The contention fails.

". . . . . . . . . . . . . . . . . . .

"Taken literally, the term 'evidence of indebtedness' might seem plainly applicable to the newspaper advertisement and written warranty setting forth Hamilton's promise to pay its customer, at the latter's option, a full refund of the purchase price, plus 5 percent interest, upon return of the diamond within the specified three-year period. Similarly, from the standpoint of the customer who purchases the diamond with the preconceived intention of exercising his option and receiving a profit of 5 percent interest, the transaction might also seem to be an 'investment contract.' As said in *State* v. *Hawaii Market Center, Inc.* (1971) 52 Hawaii 642, at page 651 . . ., involving an investment contract under the Hawaii Uniform Securities Act (Modified), 'It should be irrelevant to the protective policies of the securities laws that the inducements leading an investor to risk his initial investment are founded on promises of fixed returns rather than a share of profits. . . . The unwary investor lured by promises of fixed fees deserves the same protection as a participant in a profit sharing plan. For this reason courts have avoided a narrow definition of "profits." '

"However, as this court pointed out in *Sarmento* v. *Arbax Packing Co.* (1964) 231 Cal.App.2d 421, at page 424 . . . , 'No hard and fast rule fixes that which constitutes a "security." Rather, the question is determined on a case by case basis. *The crucial question is whether the transaction comes within the regulatory purpose of the Corporate Securities Law.*' (Italics added.)"

". . . . . . . . . . . . . . . . . . .

"The instant case is without reported judicial precedent in that here the trial court expressly found that the diamonds in question 'are ordinarily

sold at prices of $500.00 or more.' This finding is unassailed by the Department; indeed, the finding was proposed by the Department in its objections to findings proposed by Hamilton. Since, if reasonably possible, we must resolve any uncertainty or ambiguity in the finding in such a way as to support the judgment [citations], we construe the finding to be a determination of the *fair market value* of the individual gems if sold *without* the full-refund-plus-interest warranty.

"Consequently, the purchase price advertised in connection with the warranty ($500) was no greater than the value of the diamond which would serve, in effect, as security for the refund of the purchase price if the customer sought reimbursement. The customer, being adequately secured, would have placed no 'risk capital' with Hamilton; and, therefore, the transaction would not come within the regulatory purpose of the Corporate Securities Law even though 5 percent interest might ultimately be paid to the customer." (*Id.* at pp. 333-336.)

In relying upon *Hamilton,* appellant notes the following similarities: (1) the buyers are fully secured, (2) a commodity is sold, and (3) the buyers control when, if ever, the commodity is marketed. However, before examining these contentions directly, it is important to consider a substantial dissimilarity between the facts in *Hamilton* and those presented in this case.

Although *Hamilton* involved a sale and purchase of a commodity, it was not the sale itself that called in question the nature of the transaction as a possible security. If plaintiff had simply offered to sell diamonds for a cash price then no offer of a "security" would have been involved even if the sales price had exceeded the market value of the diamonds. It was the offer to redeem the diamonds within a three-year period for the full cash price plus a fixed return of 5 percent daily interest that made the transaction potentially a security. That type of redemption offer with a fixed rate of return on investment is wholly missing in this case.

There can be no question that the contracts which we presently review involve a sale of a commodity. Upon entry into the sales agreement and paying the purchase price, the investor obtains an immediate right to a specified amount of gold ore; upon entry into the refining contract he receives an unqualified right to receive, in the future, a specified number of troy ounces of refined gold, properly hallmarked and certified to be .999 pure. Beyond his commitment to deliver the specific number of ounces of gold for the agreed price, appellant does not, as in *Hamilton,* agree to secure

the value of the investment through a repurchase agreement, guaranteed return, or otherwise. The question thus is whether there are other circumstances present in this case that bring the transaction within the definition of a security when the risk capital test is applied.

The promotional materials given to the public by appellant included the following statement: "The reason for selling the gold at this price is to raise the capital for a new milling and refinery plant to be erected on the new 75 acre mill site. The new floatation mill is presently located in New Mexico. This mill must be disassembled and reassembled on our property, at which time we will be in full production."

As noted before, an element of the risk capital test is that funds solicited indiscriminately from the public at large be used for a business venture or enterprise. Respondent argues that appellant's intended use of the proceeds from sales of ore to the public satisfies this requirement. Superficially, this may be so since the construction of a mill and refinery is essential to the conduct of appellant's intended mining, milling and refining operations. However, it is equally true that every purchaser of a product from a seller, who reinvests the proceeds of the sale in his business operations, contributes to a seller's business capital. Notwithstanding, such a contribution is an investment in the purchased product and not a contribution of risk capital to a business enterprise within the normal scope of securities regulation. The issue here is whether appellant's use of the proceeds of sale for the construction of refining facilities changes the essential transaction from an ordinary sale of a commodity to capital participation in a business. We hold that it does not.

The investors who enter into both the sales and refining contracts have a single objective: to receive a fixed quantity of gold at a favorable price. The only profit they contemplate making will come, if at all, from resale of the gold to someone other than appellant at a market price that exceeds what they paid. Such investors have no interest in the profits and losses from appellant's mining and refining enterprise, except to the extent that such profits or losses enhance or impair appellant's ability to deliver the commodity which they have purchased and for which they have paid in advance. That they run a risk appellant, for whatever reason, may be unable to perform his contractual commitment to deliver refined gold does not alter the fundamental nature of the transaction from a sale of a marketable commodity to a risk capital contribution in a business enterprise.[4]

---

[4]In *People* v. *Anderson* (1939) 35 Cal.App.2d 23 [94 P.2d 627], the court held that contracts for the sale of gold ore and custom refining similar to the ones under consideration

Despite our conclusion the sales and refining contracts do not involve the contribution of risk capital to a business enterprise, we further believe the investor is adequately secured against the risk appellant might default in his performance under the refining contract. (See *Hamilton Jewelers* v. *Department of Corporations, supra,* 37 Cal.App.3d 330, 336.) In reaching this conclusion, we reject appellant's bootstrapping argument that his separate guaranty and security agreement helps satisfy the *Hamilton* test. Were we to accept appellant's argument, we would place ourselves in the absurd position of holding that where one security is used to guarantee another security both are thereby removed from the regulatory scope of section 25019. Such a result would defeat entirely that portion of the statute that subjects to security law regulation any "guarantee of" a security such as an "investment contract." Nonetheless, we find adequate security in another form.

Respondent has contended in its footnoted argument pertaining to the risk capital test that "appellant has provided no evidence of investors receiving any tangible collateral." This contention ignores the undisputed fact that adequate supplies of ore with an assayed value of .15 ounce of gold per ton are made available for immediate delivery to a purchaser under the sales contract, and that the apparent value of the gold substantially exceeds the price paid for the ore. It is true that the transportation and processing costs when added to the sales price may remove the profitability of the transaction if an investor is required to pay these costs himself. Nonetheless, there is nothing in the evidence to suggest that an investor required to take his ore elsewhere for processing cannot hope to recover all or a very substantial part of his investment. Under such circumstances, we hold the investment is adequately secured and does not involve a placement of risk capital with appellant.

Because we conclude the sales and refining contracts do not constitute an "investment contract" within the scope of section 25019, we must also conclude the guaranty and security contract in this case is by definition not a "security." Accordingly, the judgment of the trial court is reversed with directions to issue the peremptory writ of mandate requiring respondent to

constituted purchase and sale agreements covering a designated commodity and not securities subject to regulation. Since *People* v. *Anderson* was decided prior to the United States Supreme Court decision in *S.E.C.* v. *Howey Co., supra,* 328 U.S. 293, and the California Supreme Court decision in *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d 811, respondent argues that this case is no longer good law, if it ever was, and invites us either to ignore or expressly overrule it. Since the decision in *People* v. *Anderson* is consistent with our own analysis, undertaken long after *Silver Hills* and *Howey* were decided, we decline to do so.

set aside its desist and refrain order of April 4, 1986, with appellant to recover costs.

Woolpert, Acting P. J., and Best, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 10, 1987. Mosk, J., was of the opinion that the petition should be granted.