**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**BELMONT REID & COMPANY, INC., et al., Defendants,**

**John Disterdick, Bernard Zahren, and Walter Skrondal, Defendants-Appellees.**

**No. 85–2311.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 16, 1986.

Decided July 18, 1986.

Daniel L. Goelzer, General Counsel, Jacob H. Stillman, Assoc. General Counsel, David Sirignano, Stephen M. DeTore, Washington, D.C., for plaintiff-appellant.

Walter E. Skrondal, in pro per.

James W. Mercer, Laura Lingren, Greenberg, Hennigan & Mercer, Beverly Hills, Cal., Peter H. Morrison, Morrison, Cohen & Singer, New York City, for defendants-appellees.

Before CHAMBERS, SNEED, and FARRIS, Circuit Judges.

SNEED, Circuit Judge:

The Securities and Exchange Commission (SEC) appeals from the district court's grant of summary judgment in favor of defendants John Disterdick, Bernard Zahren, and Walter Skrondal. The SEC contends that the defendants' sale of gold coins on a prepayment basis was actually an investment contract, and therefore a security. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

The economic conditions out of which this case developed were those of the late 1970s and early 1980s, during which time the inflation rate was high and the demand for gold as a hedge against inflation was strong. In 1980, Continental Minerals Corporation (CMC), a closely-held Nevada corporation that developed natural resources, had assets that included several partially developed leasehold interests in what were allegedly gold-bearing properties. In order to develop some of these properties, CMC tried various means of raising capital. One of its attempts involved raising capital by selling its gold directly to investors. The gold was to be in the form of coins or medallions that it planned to mint from future gold production. The coins consisted of two types. Purchasers could buy a set of twelve one-ounce coins that bore the likenesses of famous Indian chiefs, or they could buy a set of ten one-ounce coins bearing the "universaro" design. CMC offered the sets in either "uncirculated" or "proof" quality. It gave the purchasers the option of two purchase plans: purchasers could pay for each coin separately, thirty days in advance of delivery, or they could prepay for the entire set of coins. The SEC alleges that only the second prepayment plan is a security. The difference in the prices charged by the two plans is significant. Under the thirty-day plan, the world market price of gold determined the price of the coins while, under the prepayment plan, the prices were fixed at $375 or $425 per coin, depending on whether it was of "uncirculated" or "proof" quality. Between June and September of 1980, at the time when CMC was offering the coins to the public, the prepayment price embodied a discount of about 33% to 48% below the prevailing world market price of gold. CMC promised to start delivery on November 15, 1980, and to deliver an additional coin every two months.

While the fixed price provided protection against an increase in the price of gold, CMC's prepayment plan also afforded protection against both a default by CMC on its obligations to deliver coins and a sharp decline in the world price of gold. To protect against default, the deed to the Belleville Mine (owned by CMC) was placed in a trust account. A guarantee that, if the world price of gold fell below $375 an ounce at delivery, CMC would pay purchasers the difference between their prepayment price and the world price secured the buyer against a sharp decline in that price.

As part of its "Background Information" that was provided to the prospective purchaser, CMC noted that "the gold offered for future delivery has not yet been extracted.... Obviously, if sufficient quantities of gold were being mined currently, these would be sold at world market prices and not offered at a substantial discount." Rule 13 Excerpts of Record (E.R.) at 189. The "Background Information" also noted that CMC planned "to use proceeds from sales of gold to provide additional equipment and pay other operating expenses of

the company." *Id.*[1] Clearly the greatest risk incurred by the prepayment purchaser was the possible inability of CMC to perform its part of the bargain.

Belmont Reid & Co (Belmont Reid) became involved with CMC's offering in early 1980, when CMC asked it to administer the offering. Belmont Reid used its own salesmen and recruited outside salesmen to carry out the offering. After soliciting by mail and telephone, appellee John Disterdick, a Belmont Reid salesman, sold or supervised the sale of approximately $406,-000 in contracts to about 77 investors. Bernard Zahren, an outside salesman, sold contracts to approximately 49 investors for about $766,000. Walter Skrondal, another outside salesman, sold $23,400 in contracts to four other people.

CMC failed to meet its first delivery date of November 1980. Although it rescheduled delivery several times, these reschedulings were futile. By January 1981, the $3.5 million that CMC had received from net proceeds from the sales had been spent. An involuntary bankruptcy petition eventually was filed against CMC.

The SEC filed its complaint on September 26, 1984, against Belmont Reid, against a former vice-president of CMC, and against twenty-four salesmen. It claimed that the defendants had violated the registration provisions of the Securities Act of 1933 and that they had violated the antifraud provisions of both the 1933 Act and the Securities and Exchange Act of 1934, and it sought injunctive relief. Permanent injunctions were entered by consent against twenty-one of the defendants.

On May 10, 1985, the district court granted Disterdick's, Skrondal's, and Zahren's motion for summary judgment and denied the SEC's cross-motion for summary judgment. It found no common enterprise between the purchasers and CMC and noted that "[t]he profits to the coin buyer depended upon the fluctuations of the gold market, not the managerial efforts of CMC." E.R. at 239 (Conclusion of Law 3). There-

fore, the court concluded, the contracts to prepurchase the gold coins were not securities within the meaning of the federal securities laws. *Id.* at 238. The court did find, however, that "CMC intended and defendants anticipated that the coins would be made from gold to be mined from CMC's Imperial gold mine." *Id.* at 235 (Finding of Fact 1). The SEC appeals.

II.

DISCUSSION

■ This circuit reviews grants of summary judgment de novo. *Moorhead v. United States*, 774 F.2d 936, 939–40 (9th Cir.1985). The district court's determination whether a transaction is a security is also reviewed de novo. *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 463 (9th Cir.1985).

The definitions of "security" under section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1), and under section 3 of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), are virtually identical, *see SEC v. Glenn W. Turner Enterprises*, 474 F.2d 476, 480 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), and both definitions include the phrase "investment contract." The classic test of whether a transaction is an investment contract is found in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946): "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301; *see Landreth Timber Co. v. Landreth*, —— U.S. ——, 105 S.Ct. 2297, 2305, 85 L.Ed.2d 692 (1985) (applying the *Howey* test to determine whether a transaction was an investment contract). The phrase *"solely from the efforts of others"* has not been interpreted to mean "solely" in the strict sense. In this circuit, that portion of the *Howey* test has come to mean "whether the efforts made by those other than the investor are the undeniably significant ones,

---

1. The SEC alleges particular instances of fraud and misrepresentations. Because these instan-

ces have no bearing on the merits of the case before us, we do not discuss them here.

those essential managerial efforts which affect the failure or success of the enterprise." *Glenn W. Turner*, 474 F.2d at 482; *see United States v. Morse*, 785 F.2d 771, 776 (9th Cir.1986). Courts have applied the *Howey* test in a variety of circumstances. *See International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559, 99 S.Ct. 790, 796, 58 L.Ed.2d 808 (1979) (a mandatory-contribution pension plan is not a security); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 858, 95 S.Ct. 2051, 2063, 44 L.Ed.2d 621 (1975) (a low-income cooperative housing unit is not a security); *Tcherepnin v. Knight*, 389 U.S. 332, 338–39, 88 S.Ct. 548, 554–55, 19 L.Ed.2d 564 (1967) (a withdrawable capital share in a savings and loan is a security); *SEC v. Commodity Options International, Inc.*, 553 F.2d 628, 632–33 (9th Cir.1977) (a naked double option is a security).

This case is a close one. It is clear that the issue before us is whether the transaction in this case meets the third requirement of the *Howey* test—that profits come "solely" from the efforts of others. As already pointed out, the purchaser's greatest risk under the prepayment plan was the possible failure of CMC to deliver the coins. Any such failure could be the consequence of various misfortunes or breaches of faith of which the failure of the mine to yield sufficient gold would be prominent on any list. Viewed from this angle it is easy to assert that the failure or success of the enterprise in which the prepayment purchaser was engaged depended significantly on the managerial efforts of CMC and for that reason the third requirement of the *Howey* test is met.

The difficulty we have with this analysis is its ready applicability to any sale-of-goods contract in which the buyer pays in advance of delivery and the ability of the seller to perform is dependent, in part, on both his managerial skill and some good fortune. Perhaps the SEC views such contracts as covered by *Howey*. If so, we must express our doubts.

█ As we view it, the prepayment plan purchasers in this case had as their primary purpose to profit from the anticipated increase in the world price of gold. Immediately prior to their purchases such prices had increased rapidly. It was not unreasonable to expect the price to continue to climb. In short, the purchasers were speculating in the world gold market. Admittedly, one can do much the same thing by buying a share in a company mining gold. However, that is not what was done here. To the extent the purchasers relied on the managerial skill of CMC they did so as an ordinary buyer, having advanced the purchase price, relies on an ordinary seller. We therefore agree with the district court that "[p]rofits to the coin buyer depended upon the fluctuations of the gold market, not the managerial efforts of CMC," E.R. at 239 (Conclusion of Law 3); we hold that the profits in this case did not come "solely" from the efforts of others, and that this transaction was not a security within the meaning of the federal security laws. *See Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir.1980) (per curiam) (holding that the sale of silver bars was not an investment contract because the expected profits came from market fluctuations); *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F.Supp. 359, 367 (S.D.N.Y.1966) (holding that contracts to purchase sugar for future delivery were not "investment contracts" because the expected profits came from market fluctuations). Accordingly, the judgment of the district court is affirmed.

AFFIRMED.