**SECURITIES AND EXCHANGE COMMISSION, Plaintiff–Appellee,**

v.

**R.G. REYNOLDS ENTERPRISES, INC.; Richard Reynolds, Defendants–Appellants.**

**No. 90–55185.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 12, 1991.

Decided Dec. 30, 1991.

Arthur L. Scovis, Scovis & Scovis, Thousand Oaks, Cal., for defendants-appellants.

Lucinda O. McConathy, S.E.C., Washington, D.C., for plaintiff-appellee.

William R. Bickford, George A. Crawford, Sr. Trial Counsel, Los Angeles, Cal., for Dept. of Corporations, State of Cal.

Before NORRIS and THOMPSON, Circuit Judges, and KING,* District Judge.

WILLIAM A. NORRIS, Circuit Judge:

This appeal presents the question whether interests in two separate investment programs sold by Richard Reynolds and R.G. Reynolds Enterprises, Inc. are securities. We hold that they are and affirm the district court's award of summary judgment in favor of the Securities and Exchange Commission.

I

Richard Reynolds formed R.G. Reynolds Enterprises, Inc. in January 1985. As president, sole shareholder, and chairman of the board of Reynolds Enterprises, Reynolds directed its operations, which included the sale of the investment programs that are at issue in this appeal, a weekday financial talk show on the radio, "The Reynolds Rap," and a television show on the same subject called "The Reynolds Report." Reynolds also published a monthly financial newsletter, "The Reynolds Report," and offered personal investment advice

---

* Honorable Samuel P. King, Senior United States District Judge of the District of Hawaii, sitting

by designation.

through consultations with persons who paid the subscription fee.

*The Managed Account.* Beginning in 1985, Reynolds and Reynolds Enterprises offered and sold an investment program that Reynolds variously called a "Managed Account," a "discretionary account," the "30% Net Investment Program," and the "Loan Program." Whatever name was used, an investment in the program was made in cash and the investor was promised a high rate of return. A typical letter describing the program is set out in the margin.[1] Investors in this program testified that Reynolds purported to be an expert in the market who had earned very high returns for himself and his clients. He indicated that he would invest their money in the stock and futures markets. Investors in the Managed Account received monthly account statements, always indicating that their investments had appreciated. Reynolds testified that he made up account numbers for investors at random. He said that he kept records of the loan program on little slips of paper and in his head.

Reynolds raised approximately $2 million from at least 148 investors in several states through the Managed Account from early 1985 until at least April, 1987. Much of the money came from small investors who invested $2,000 to $10,000.

Reynolds described the program in his deposition testimony as a "Loan Program," in which he borrowed funds from his clients for six months to two years at varying interest rates. Reynolds deposited the funds in a single account and used a large portion of the funds to pay for air time for his television and radio shows and other business expenses unrelated to the investments. Reynolds also used investors' funds to gamble in Las Vegas and to pay for his then fiancee's rent, car, and other personal expenses. When payment on the investments became due, Reynolds offered to renew the investments, usually at a rate of 20% or 25%. In 1986, Reynolds and Reynolds Enterprises began issuing promissory notes to investors in the Managed Account. These notes promised to pay a sum certain at a stated rate of interest, usually between 20% and 30%, at a specified time in the future, usually 6 or 12 months.

*The Moreland Gold Program.* In December 1987, Reynolds and Reynolds Enterprises began to sell interests in a gold ore refining venture referred to as the Moreland Gold Program, located in Kern County, California, and operated by William Moreland, who appeared on Reynolds' show to promote the venture. Reynolds and Moreland told investors that the cost of gold to the investor in the program was $250 an ounce. This price was a significant discount from the market price of gold at the time. On his television program, Reynolds pointed to the difference between the offering price of $250 an ounce and the current price for gold at $340 an ounce, stating that there was no fund that could give investors as much growth in four months.

In soliciting investors, Reynolds and Reynolds Enterprises sent out an offering brochure. The introduction explained that Moreland was selling "previously mined gold ore reserves" in order "to raise the capital for a new milling and refinery plant" and concluded that "this project will be a very profitable investment with little or no risk." AER at 22, 24. The remaining 50 pages of the packet contained maps, flow charts showing how the new mill would operate and what processes it would employ, reports of metallurgical work, engineering and geologists' reports, proof of

---

**1.** My managed accounts deal in investing in the stock and futures market.... This account is based on twelve months the management fee is deducted based on performance.

    A. If you make 100% or more then we receive 10% of your profits only.

    B. If we make you 50% to 99% at the end of twelve months, then the management fee is 5% of your profits.

    C. And finally if we make you anything less than 49% growth, then we only receive 1% of the profits only.

My personal track record of earning my clients a minimum of 48.6% growth on their investments for four years straight cannot be matched or disproved by anyone.

Appellee's Excerpts of Record ("AER") at 1.

ownership of mining properties, the resume of Joseph Johnson, the consulting geologist, and Moreland's resume, showing his expertise in many areas including mining and milling operations.

Investors received, for a single price, a sales contract, a refining contract and a security agreement. Each sales contract stated that Moreland was conveying a specified amount of gold ore with a gold content of .15 ounces of gold per ton. For each payment of $5000, investors were to receive 133 tons of ore, which were supposed to yield 20 ounces of gold. The contract stated that the ore was ready for shipment and could be removed at the buyer's expense, but there is no evidence that any of the investors took advantage of this option. The refining contract explicitly obligated Moreland to mill the ore and deliver the gold, but stated that milling would only begin at an indefinite time in the future, after 30,000 tons of ore had been sold and up to four months had elapsed. The refining contract provided that Moreland would refine the ore and deliver the gold to a reputable company for hallmarking and certification of the gold's purity. The third contract, a "Security Agreement," purported to guarantee Moreland's performance. It recited that Moreland was the owner of certain dolomite mining claims and that these claims had been transferred to a trust. In the event of his default on the sales and refining contracts, the trustee was to sell the mining claims to reimburse the buyer in the amount of the contract price plus interest.

Reynolds used the information package to sell the Moreland Gold Program, stating on his radio show, "I've checked [Moreland Gold] out so thorough it's not even funny." Appellee's Supplemental Excerpts of Record ("ASER") at 712. On his television show, he assured the public that the Moreland Gold Program was "safe as safe could be," and that there was no risk involved. ASER at 680, 685. However, there is no evidence that Reynolds performed any independent analysis of the Moreland Gold Program.

Reynolds raised approximately $1.8 million from 245 investors in several states for the Moreland Gold Program, between December, 1985 and April, 1986. Reynolds Enterprises received sales commissions of 35%. Only three investors in the Moreland Gold Program received any return of the principal they invested. Nor have investors received any funds from the dolomite that was supposed to be sold in the event of Moreland's default.

*The Proceedings Below.* The SEC brought this action naming as defendants Reynolds and Reynolds Enterprises.[2] The SEC charged that they violated the antifraud provisions of § 17(a) of the Securities Act, 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, by making misrepresentations and omissions in offering and selling the Managed Account and the Moreland Gold Program. The SEC charged that they violated the registration provisions of § 5(a) and (c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c), by offering and selling unregistered securities. The SEC also charged that they violated § 15(a)(1) of the Securities Exchange Act, 15 U.S.C. § 78o (A)(1) by selling securities without registering as a broker-dealer.

The SEC also alleged that Reynolds acted as an investment adviser without registering with the SEC, in violation of § 203(a) of the Investment Advisers Act, 15 U.S.C. § 80b-3(a), and that he defrauded his clients in violation of § 206(1) and (2) of the Act, 15 U.S.C. §§ 80b-6(1) & (2). It further charged that in offering the Managed Account, Reynolds operated an unregistered investment company in violation of § 7(a) of the Investment Company Act, 15 U.S.C. § 80a-7(a).

The district court ruled on summary judgment that appellants had violated the securities laws. On appeal, Reynolds and Reynolds Enterprises argue that the investments at issue were not securities within the meaning of the Securities Acts.

---

**2.** Moreland and Joseph Johnson, Moreland's consulting geologist, were also named as defendants. Moreland and Johnson consented to permanent injunctions.

## II

First, we consider whether the investors' financial interests in the Managed Account are securities.[3] The Managed Account involves financial interest in two forms: (1) the somewhat ill-defined interest initially offered, in which investors gave Reynolds cash and he promised them a high rate of return; and (2) promissory notes issued to investors who had already entered the program.

We recognize that in passing the Securities Acts, "Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 949, 108 L.Ed.2d 47 (1990) (quoting *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946)). Thus, Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Id.* "Security" is defined in both § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), and § 3(a)(10) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), to include "investment contracts" and "notes." The SEC contends that the financial interests initially offered to investors in the Managed Account are "investment contracts" and that the promissory notes issued later are "notes" within the meanings of those definitions.[4] We agree.

## A

To determine whether a financial interest constitutes an "investment contract," we apply the three-prong test put forward in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). The elements of this test are (1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others. *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir.1989) (en banc), *cert. denied*, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). Appellants do not dispute that the first prong of the *Howey* test is met, but rather assert that the Managed Account was not a "common enterprise" and that the investors did not depend for their profits upon the efforts of Reynolds and Reynolds Enterprises.

The second prong of *Howey* requires either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality). *Hocking*, 885 F.2d at 1455. Vertical commonality may be established by showing "that the fortunes of the investors are linked with those of the promoters." *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 463 (9th Cir.1985). One indicator of vertical commonality, though by no means the only indicator, is an arrangement to share profits on a percentage basis between the investor and the seller or promoter. *Id.* In the instant case, Reynolds told investors

---

**3.** Appellants have not raised any genuine issues of material fact. Rule 56(e) of the Federal Rules of Civil Procedure provides that when a motion for summary judgment is made and supported, an adverse party's response may not rest upon mere allegations or denials of the pleadings, but must set forth "specific facts" showing that there is a genuine issue for trial. The evidence relied upon by the non-moving party must be of such caliber that "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented. The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Appellants' opening brief pointed to not one specific fact showing the existence of a genuine issue for trial. Appellants' reply brief points to deposition testimony of investors that they expected to get their money back and deposition testimony of an employee of Reynolds Enterprises characterizing the Managed Account interests as loans. However, these facts alone do not create a genuine issue of material fact.

**4.** The Supreme Court has consistently held that the definitions of a security in the 1933 and 1934 Acts are virtually identical and that the coverage of the acts may be considered the same. *Reves*, 110 S.Ct. at 949 n. 1; *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44 L.Ed.2d 621 (1975).

that he would take a management fee based on a percentage of the profits, thus making his own profit contingent on the profit of his investors. *See supra* note 1. This is sufficient to show vertical commonality and satisfy the second prong of *Howey*.[5]

■ The third prong of *Howey* requires an expectation of profits produced by the efforts of others. This requirement is met when " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *Hocking*, 885 F.2d at 1455 (quoting *SEC v. Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir. 1973)). Because Reynolds exercised complete control over the investment of funds in the Managed Account, the third prong of *Howey* is satisfied and the financial interests in the Managed Account are "investment contracts" and therefore "securities."

## B

■ We turn now to the question whether the promissory notes issued in connection with the Managed Account are "notes" within the meaning of the Securities Acts. Under *Reves*, any note is presumed to be a security unless it falls into certain judicially created categories that obviously are not securities or bears a "family resemblance" to notes in those categories. *Reves*, 110 S.Ct. at 951. Appellants argue that the promissory notes issued by Reynolds bear a family resemblance to notes "evidencing a 'character' loan to a bank customer," *id.* (quoting *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976)), because investors loaned Reynolds money based on his good character.[6]

■ "Family resemblance" is determined by looking at four factors: (1) the motivation for entering the transaction; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) whether there are any risk reducing factors that would make application of the securities laws unnecessary. *Reves*, 110 S.Ct. at 951–52. With regard to the first factor, an instrument is likely to be a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate." *Id.* Here, Reynolds sought to raise money for the ostensible purpose of financing substantial investments and investors sought to earn a profit in the form of interest. As to the plan of distribution, the notes were "offered and sold to a broad segment of the public," which suggests that the notes are securities. *Id.* at 953. As for the third factor, letters for Reynolds characterizing the Managed Account as an investment program would lead an investor reasonably to think of her financial interest as an investment. Finally, there appear to be no risk reducing factors that would make application of the securities laws unnecessary. We hold, therefore, that the promissory notes at issue here are "securities."

■ That some of the promissory notes have a maturity of less than nine months does not alter our conclusion, even though

---

5. Appellants' reliance on *Brodt v. Bache & Co., Inc.*, 595 F.2d 459 (9th Cir.1978), is misplaced. In *Brodt*, we held that a discretionary commodities account lacked vertical commonality "because the success or failure of Bache as a brokerage house does not correlate with individual investor profit or loss. On the contrary, Bache could reap large commissions for itself and be characterized as successful, while the individual accounts could be wiped out." *Id.* at 461. In the instant case, by contrast, Reynolds purported to make his own profit dependent on the profit of his investors.

The SEC contends that horizontal commonality also exists because Reynolds pooled investors' funds in a common bank account. On the other hand, it is not clear that investors knew that their funds would be pooled with those of other investors. In any event, we need not reach the question whether horizontal commonality exists because the existence of vertical commonality is sufficient to meet the second prong of *Howey*.

6. In arguing that the notes are loans, appellants also rely on the "risk capital" test of *Great Western Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir.1976). However, the Supreme Court has rejected the "risk capital" test as a means for determining whether an investment is a "note" for the purposes of the Securities Acts. *Reves*, 110 S.Ct. at 950–51.

both the 1933 and the 1934 Acts include an exception for notes with less than nine months maturity. *See* 15 U.S.C. §§ 77c(a)(3), 78c(a)(10). In *Reves,* the Court explicitly left open the question whether the presumption that every note is a security applies to such short-term notes. *Reves,* 110 S.Ct. at 951 n. 3. However, a number of circuits have limited the short-term note exception to commercial paper as opposed to investment securities. "[T]he mere fact that a note has a maturity of less than nine months does not take the case out of [the Securities Acts], unless the note fits the general notion of 'commercial paper.'" *Zeller v. Bogue Electric Manufacturing Corp.,* 476 F.2d 795, 800 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973); *see also Holloway v. Peat, Marwick, Mitchell & Co.,* 900 F.2d 1485, 1489 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 386, 112 L.Ed.2d 396 (1990); *Baurer v. Planning Group, Inc.,* 669 F.2d 770, 776 (D.C.Cir.1981); *McClure v. First Nat'l Bank,* 497 F.2d 490, 494–95 (5th Cir. 1974), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975); *Sanders v. John Nuveen & Co.,* 463 F.2d 1075, 1080 (7th Cir.), *cert. denied,* 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972). We agree with these circuits that logic and legislative history favor limiting the short-term note exception to commercial paper and hold that the presumption that a note is a security applies equally to notes of less than nine months maturity that are not commercial paper.

While the short-term note exceptions are not explicitly limited to short-term commercial paper, the literal words of the statutes are not dispositive. In defining the coverage of the Securities Acts, Congress in each case prefaced the definitions with the phrase "unless the context otherwise requires." 15 U.S.C. §§ 77b & 78c. Furthermore, the Supreme Court has emphasized

that in interpreting the Securities Acts "we are not bound by legal formalisms, but instead take account of the economics of the transaction under investigation." *Reves,* 110 S.Ct. at 949. "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975) (quoting *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). *Reves* reaffirmed this principle by holding that certain categories of notes are not securities: "the phrase 'any note' should not be interpreted to mean literally 'any note,' but must be understood against the backdrop of what Congress was attempting to accomplish." *Reves,* 110 S.Ct. at 950. Similarly, "any note with a maturity not exceeding nine months" should not be interpreted to mean literally "any note with a maturity not exceeding nine months." As with the Securities Acts generally, we must interpret the short-term note exception to effectuate Congress' intent.

The legislative history of the 1933 Act indicates that the exemption was meant to apply to "short term paper of the type available for discount at a Federal Reserve bank and of a type which rarely is bought by private investors." H.R.Rep. No. 85, 73d Cong., 1st Sess. 15 (1933). Drawing on the legislative history of the 1933 Act, the SEC has interpreted its exemption to apply only to commercial paper. Securities Act Release No. 33–4412, 26 Fed.Reg. 9158 (1961).[7] There is no indication that Congress' intent was any different with respect to the 1934 Act.[8] The Supreme Court has noted that Congress intended the definitions of "security" in the Acts to be "'substantially the same.'" *Tcherepnin v.*

---

**7.** While the SEC's view is not conclusive, it is entitled to substantial weight. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).

**8.** The only difference in the language of the two exemptions is that the 1934 Act omits the phrase "which arises out of a current transaction or the proceeds of which have been or are to be used

for current transaction." *Compare* 15 U.S.C. § 77c(a)(3) *with id.* § 78c(a)(10). Given the absence of any explanation for the omission, other courts have construed the 1934 Act's exclusion of short term notes as coextensive with the 1933 Act's exemption of commercial paper. *See, e.g., Baurer,* 669 F.2d at 777 & n. 20.

*Knight,* 389 U.S. 332, 342, 88 S.Ct. 548, 556, 19 L.Ed.2d 564 (1967) (quoting S.Rep No. 792, 73d Cong., 2d Sess. 14 (1934)); *Reves,* 110 S.Ct. at 949 n. 1.

Moreover, we construe the Securities Acts broadly to effectuate Congress' purpose to protect investors. *Forman,* 421 U.S. at 849, 95 S.Ct. at 2059. Including all notes with a maturity of less than nine months within the exemptions of the Securities Acts would serve no discernable legislative purpose. In the instant case, those investors who were issued six month promissory notes were no less in need of statutory protection than investors who received twelve month promissory notes.[9] Although "the longer one's funds are to be used by another, the greater the risk of loss," *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1257 (9th Cir.1976), time is simply one factor to be assessed in looking at the economic realities of the investment. *Id.* at 1257–58. Under the *Reves* test, we may continue to weigh the maturity of a note as a factor that may "significantly reduce[ ] the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Reves,* 110 S.Ct. at 952. However, in the instant case, the shorter term of some of the promissory notes did not materially reduce the risk to investors. We hold therefore that all the promissory notes issued in connection with the Managed Account are "notes" within the meaning of the Securities Acts.

### III

Next, we consider whether interests in the Moreland Gold Program are securities.[10]

### A

■ Investors in the Moreland Gold Program received a sales contract, a refining contract, and a security agreement for a single price. The SEC argues that the interests in the Moreland Gold Program are "investment contracts" under *Howey* and are therefore "securities." Appellants argue that because the gold ore could be removed and refined by investors themselves there was no "common enterprise" and investors were not dependent for profits on the efforts of others. In other words, they argue that the second and third prongs of the *Howey* test are not satisfied.

In our view, this case is not distinguishable in any material respect from *Howey* itself. The Howey Company owned citrus groves, which it sold in small parcels to investors. Along with the land sale contracts, the Howey Company offered service contracts for care of the investors' parcels. The investors were free to contract with another company for service of the groves, and 15% of the acreage sold was in fact not covered by Howey's service contracts. *Howey,* 328 U.S. at 295, 66 S.Ct. at 1101. The Supreme Court held that the land sales contracts and the service contracts should be read together and that, together, they constituted "investment contracts." *Id.* at 297–98, 66 S.Ct. at 1102–03.

Under the Moreland Gold Program investors paid a single price for relatively small amounts of ore and a refining contract. While the sales contract gave investors the

---

**9.** This case demonstrates the illogic of construing the exemptions to apply to all investment notes of less than nine months maturity. Were we to hold that the exemptions applied, appellants would be liable for securities violations on the basis of the investment contracts and promissory notes of nine months or more maturity under both Securities Acts, the Investment Advisers Act, and the Investment Company Act. As to the notes of less than nine months maturity, appellants would be liable under the Investment Advisers Act and the Investment Company Act, which do not contain any exemptions for short-term notes. Appellants would also be liable under the antifraud provision of the 1933 Act, 15 U.S.C. § 77q(a), which provides that the short-term note exception does not apply. However, appellants would not be liable under the registration provisions of the 1933 Act or the antifraud provision of the 1934 Act. It seems highly improbable that Congress would have intended such a result.

**10.** Again, appellants have failed to show the existence of a genuine issue of material fact. The only evidence cited by appellants on appeal is Moreland's deposition testimony that investors were free to have the gold refined themselves. However, investors' legal right to refine the gold independently is not in dispute.

right to make other arrangements for the refining of their ore, there is no evidence that a single investor exercised that right. Promotional materials for the program did not emphasize investors' legal right to refine the ore themselves but rather Moreland's commitment to build a new refinery at which investors' ore would be processed. Furthermore, since the refining contract was included in the price paid for the ore, investors would have incurred unnecessary costs if they had the ore transported and refined elsewhere. Given these economic realities, it would defy common sense to read the ore sales contract separately from the refining contract. When the contracts are read together it is clear that investors' interests in the Moreland Gold Program are "investment contracts," just as the investors' interests in *Howey* were.

Appellants' arguments that the second and third prongs of *Howey* are not satisfied are unpersuasive. *Howey*'s second prong—the "common enterprise" prong—may be satisfied by showing either horizontal or vertical commonality. The pooling of investors' funds to finance the construction of a plant where their ore was to be refined establishes horizontal commonality and, therefore, we need not reach the question whether vertical commonality also existed.

■ *Howey*'s third prong—an expectation of profits produced by the efforts of others—is met when " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *Hocking,* 885 F.2d at 1455 (quoting *SEC v. Glenn W. Turner Enterprises,* 474 F.2d 476, 482 (9th Cir.1973)). Moreland undertook to finance, construct, and operate the refining plant, to refine investors' ore, and to deliver the gold to a reputable company for hallmarking and certification of its purity. These were the essential managerial efforts that would affect the success or failure of the Moreland Gold Program.

## B

Appellant relies upon *Moreland v. Department of Corporations,* 194 Cal.App.3d 506, 239 Cal.Rptr. 558 (1987), in which the California Court of Appeal held that interests in the Moreland Gold Program were not securities under the California Corporate Securities Law. Because the California Corporate Securities Law was patterned after the Securities Act of 1933, the *Moreland* court looked to Ninth Circuit cases interpreting federal law for guidance. *Id.* at 512–13, 239 Cal.Rptr. 558. We believe the *Moreland* court misconstrued our court's past decisions in reaching its result.

In holding that the second prong of *Howey* had not been met, the *Moreland* court misinterpreted the requirements for vertical commonality under our decision in *SEC v. Goldfield Deep Mines Co. of Nevada,* 758 F.2d 459 (9th Cir.1985).[11] The Court of Appeal distinguished the Moreland Gold Program from the investments at issue in *Goldfield* on the ground that there was an agreement in *Goldfield* for the promoters to receive a fixed percentage of the profits. 194 Cal.App.3d at 515, 239 Cal.Rptr. 558. What we held in *Goldfield,* however, was that sharing profits on a percentage basis was a sufficient condition for vertical commonality; we did not hold that it was a necessary condition. The necessary condition is that the fortunes of the investors be linked with those of the promoters, sellers, or some third party. *Id.* at 463; *Hocking,* 885 F.2d at 1455. In the Moreland Gold Program, vertical commonality exists because Moreland was expected to profit from the refining of investors' ore by retaining other minerals extracted from the ore and any gold in excess of the amount promised to investors.[12]

---

11. The *Moreland* court did not discuss whether horizontal commonality existed in the Moreland Gold Program. *See* 194 Cal.App.3d at 513–16, 239 Cal.Rptr. 558. However, the common enterprise requirement of *Howey* can be met by showing either vertical or horizontal commonality. *Hocking,* 885 F.2d at 1459.

12. The Court of Appeal also suggests that under *Goldfield* vertical commonality will not exist unless the refining technique is "unique or experimental." 194 Cal.App.3d at 516, 239 Cal. Rptr. 558. However, in *Goldfield* we held that the uniqueness of the ore processing technique would be an *alternative* way to establish that the

The Court of Appeal also misread our decisions in concluding that the third prong of *Howey* had not been met. It suggested that under *Goldfield,* unless a promoter retains control over marketing the commodity, investors' profits are not "dependent upon his managerial skills or efforts." 194 Cal.App.3d at 516, 239 Cal.Rptr. 558. While the promoter in *Goldfield* retained control over marketing the commodity, we did not say that such control was either a necessary or even a sufficient condition for satisfying the third prong of *Howey.* The test under *Howey*'s third prong is whether " 'the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.' " *Hocking,* 885 F.2d at 1455 (quoting *SEC v. Glenn W. Turner Enterprises,* 474 F.2d 476, 482 (9th Cir.1973)). In the case of the Moreland Gold Program, it was Moreland's efforts in financing, constructing, and operating the refining plant that would have been the undeniably significant ones, not investors' efforts in marketing the refined gold.

Lastly, the Court of Appeal relied on our decision in *SEC v. Belmont Reid & Co.,* 794 F.2d 1388 (9th Cir.1986), in which we held that contracts for the purchase of gold coins to be minted from future gold production were not securities because they failed to meet *Howey*'s third prong. However, the Court of Appeal overlooked the fact that our decision in *Belmont* was based on the unique fact that those contracts were made during a period when the value of gold was appreciating rapidly and that investors "had as their primary purpose to profit from the anticipated increase in the world price of gold." *Id.* at 1391. There is

no evidence that investors in the Moreland Gold Program were depending on increases in the market price of gold for their profits. Rather, investors expected profits to come primarily from the discount below the current price of gold at which the gold ore was being offered. Investors were dependent on Moreland's efforts in refining the gold ore to realize profits from that discount.[13]

## IV

■ Appellants raise a number of other meritless arguments. They argue that the district court lacked jurisdiction because service of the summary judgment motion was defective. However, the record is clear that appellants had more time to respond than the ten days required under Rule 56(c). Any defect in service was harmless because appellants had ample time to respond to the summary judgment motion.

■ Appellants argue that Reynolds' deposition testimony cannot be used to support a motion for summary judgment because his counsel at the deposition was not a member of the California bar. However, absent some indication that counsel at the deposition provided Reynolds with inadequate representation, this is no reason to declare that Reynolds' deposition testimony is inadmissible.

Appellants also argue that their motion to exclude evidence seized by the postal inspector was improperly denied. Even if the exclusionary rule applies in this civil proceeding and may be invoked against an agency other than the agency that conducted the search, questions we do not decide, we hold that the search was not improper.

---

fortunes of investors and promoters were linked, since "[i]f the processing technique were to prove faulty, then both the investors and [promoters] would suffer financial losses." 758 F.2d at 463.

**13.** In *Belmont,* gold was also being offered at a discount below market price. 794 F.2d at 1389. However, in holding that the contracts for gold coins were not securities, we did not rely on this discount but instead relied solely on the fact that investors anticipated an increase in the price of gold. *Id.* at 1391.

We also commented in *Belmont* that the third prong of *Howey* might apply to any sale-of-goods contract in which the buyer pays in advance. However, we are no longer troubled that an ordinary sale-of-goods contract would be covered by *Howey* test. When a purchaser acquires a commodity for personal consumption or for use or resale in business, there is no "investment" or "profit" within the meaning of the *Howey* test. *See Forman,* 421 U.S. at 858, 95 S.Ct. at 2063.

We have previously held that warrants, like those in the instant case, authorizing the seizure of all documents related to a business do not violate the particularity requirement of the Fourth Amendment, *United States v. Gomez–Soto*, 723 F.2d 649, 653 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984), and appellants point to no specific items seized that were beyond the scope of the warrants. The manner in which these warrants were served is expressly authorized by Federal Rule of Criminal Procedure 41(d).

Finally, appellants argue that Reynolds was exempt from the Investment Advisers Act of 1940 because he was the publisher of an investment newspaper. However, the SEC does not claim that Reynolds violated the Act by publishing a newspaper but rather by engaging in personal consultations with investors. The exception for publishers applies to "entirely impersonal" communications and does not exempt Reynolds' personal consultations with investors from the coverage of the act. *Lowe v. SEC*, 472 U.S. 181, 210, 105 S.Ct. 2557, 2573, 86 L.Ed.2d 130 (1985).

V

Because the Managed Account and the Moreland Gold Program involved the offer and sale of securities, we hold that the district court properly determined that Reynolds and Reynolds Enterprises violated various provisions of the securities laws. We further hold that the district court did not abuse its discretion in granting a permanent injunction against future violations of these laws. *See SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980) ("The existence of past violations may give rise to an inference that there will be future violations.").

AFFIRMED.