62 F.3d 1425
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Murray I. BROOKS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Croft IRELAND, Defendant-Appellant.
 Nos. 93-50121, 93-50122.
 United States Court of Appeals, Ninth Circuit.
 Submitted July 11, 1995.*
Decided July 28, 1995.
 
 Before: FARRIS and O'SCANNLAIN, Circuit Judges; TASHIMA,** District Judge.
 MEMORANDUM***
 Murray Brooks and Croft Ireland appeal their convictions and sentences for securities fraud, wire fraud, and conspiracy. Brooks also appeals his restitution order. We affirm.
 * Both Brooks and Ireland argue that the "units" they sold in Gold Hill '88 were sale-of-goods contracts and not securities. As a result, they claim, the district court erred (a) by denying their pretrial motions to dismiss the securities fraud counts, and (b) by giving an erroneous jury instruction on the definition of a "security."
 * A "security" within the meaning of the Securities Act of 1933, 15 U.S.C. Sec. 77b(1), is defined to include an "investment contract." Id. The three-part test for an "investment contract," set out in SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946), is: (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits produced by the efforts of others. The third element of Howey is met when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." Hocking v. Dubois, 885 F.2d 1449, 1455 (9th Cir. 1989) (en banc) (quotation omitted), cert. denied, 494 U.S. 1078 (1990).
 We conclude that Brooks' efforts were the "undeniably significant ones" in making Gold Hill '88 a success. Gold Hill '88 is functionally identical to the Moreland Gold Program we discussed in SEC v. R.G. Reynolds Enterprises, Inc., 952 F.2d 1125, 1133-35 (9th Cir. 1991). Like Moreland, Brooks undertook to finance the equipping and operation of a gold mine as well as the construction of a concentration plant at the mine. As the prospectus stated, the purpose of Gold Hill '88 was "to raise funds to build a plant" at the mine. In other words, Brooks was to provide "the essential managerial efforts that would affect the success or failure of" Gold Hill '88.[1] Thus, the Gold Hill '88 units were "securities," and the district court did not err in refusing to dismiss the securities fraud counts.
 B
 The district court instructed the jury on the definition of an "investment contract" under Howey. The district court expressly included the theory of Belmont Reid in its instruction. Ireland's and Brooks' argument that the district court should have separated out the Belmont Reid theory from this instruction misunderstands the Howey test. The Belmont Reid court clearly stated that its analysis fell under the third prong of the Howey test. See 794 F.2d at 1391. In short, the instruction given by the district court fairly and adequately covered the defendants' theory of defense based on Belmont Reid.
 II
 Brooks claims the criminal case against him violated the Double Jeopardy Clause because he was already punished in a prior civil proceeding brought by the U.S. Postal Service. In February 1989, the Postal Service charged Brooks with civil mail fraud (39 U.S.C. Sec. 3005) and brought an injunctive proceeding against him. The case culminated in a stipulated injunction that allowed the Postal Service to detain checks mailed to Brooks by Gold Hill '88 investors pending resolution of the charges.
 The Double Jeopardy Clause protects against multiple punishments for the same offense. United States v. Halper, 490 U.S. 435, 440 (1988). In Halper, the Supreme Court explained that some civil penalties "may be so extreme ... as to constitute punishment." 490 U.S. at 442. This occurs when the civil penalty "may not fairly be characterized as remedial, but only as a deterrent or retribution." Id. at 449. The injunction allowing the Postal Service to detain Brooks' mail was none of the above. The government did not even seek a remedy in the injunction; it merely sought to preserve the status quo while the case against Brooks was resolved. No penalty, for remedial purposes or otherwise, was imposed.
 III
 On May 27, 1992, Brooks filed a request for $44,000 in public funds pursuant to the Criminal Justice Act, 18 U.S.C. Sec. 3006A(e), for the expert services of an accountant in preparing his defense. The district court subsequently granted him $2500.
 
 
 1
 Brooks neglects to mention that he utilized the $2500 to present expert accounting testimony at trial. Kathryn Nolte, an accountant, testified for Brooks and attempted to explain several of the canceled checks in evidence by suggesting that it was not unusual for Brooks to have drafted large checks payable to cash from the investors' funds. Brooks has not presented clear and convincing evidence that more than $2500 was necessary to present expert testimony for his defense or that expert testimony in addition to Nolte's would likely have affected the outcome of his trial. See Bonin v. Calderon, No. 92-56299, slip op. at 8019 (9th Cir. June 28, 1995) (defendant claiming error for failure to provide funds under Sec. 3006A must establish that his defense was prejudiced by clear and convincing evidence).
 
 
 2
 In a related argument, Brooks claims the prosecution is guilty of outrageous government conduct because it misrepresented the testimony of its own expert witness, Nancy Hyder. The prosecution represented to the court that Hyder would only testify regarding the flow of money through Brooks' hands for personal uses. The prosecution also stated that the witness would not give an opinion on whether misappropriation had taken place. The prosecution does not appear to have misrepresented the intended content of Hyder's testimony. Hyder only stated by way of background that her job was to determine if there was misappropriation. Brooks himself pointed out the isolated sentences in Hyder's report that stated that misappropriation would be demonstrated. In neither case did the prosecution intentionally elicit a conclusion or opinion from Hyder. To the limited extent Hyder's testimony could be construed as giving an expert conclusion, the court's intervention and cautionary instructions to the jury would seem to have minimized its prejudicial effect. See United States v. Endicott, 803 F.2d 506, 513 (9th Cir. 1986), cert. denied, 114 S. Ct. 456 (1993).
 
 IV
 
 3
 Six weeks before trial, Brooks filed a request for a continuance of his trial date. The district court denied Brooks' request. Brooks argues that, because of his pro se status and the complexity of the case, it was an abuse of discretion for the district court to deny his request for a continuance.
 
 
 4
 Between the time he was indicted (March 1991) and the beginning of his trial (September 1992), Brooks had a total of eighteen months to prepare for his trial. This was more than enough time to prepare for what amounted to a four-day jury trial. Even though part of this time passed while venue was in Georgia, Brooks still had five months to prepare after the case was transferred to California. In addition, the previous thirteen months' work was not wasted because the trial was on the same charges.
 
 V
 
 5
 Brooks claims there was insufficient evidence to support his conviction on the wire fraud counts (18 U.S.C. Sec. 1343).
 
 
 6
 At trial, Brooks' defense centered on his contention that he did not intend to defraud investors and that he had a good faith belief in the viability of the mine. The evidence of Brooks' intent to defraud was straightforward, however. Brooks was aware of Dr. Johnson's final report that stated, among other things, that Brooks lacked a permit to operate the mine, that the assays used by Brooks were handpicked and did not represent the true quality of the ore, and that the ore actually had less than .002 ounces of gold per ton. Brooks neither disclosed this information to investors nor corrected the information in the prospectus and mineral assays that represented otherwise.
 
 VI
 
 7
 At sentencing, Brooks requested the district court to depart downward from the applicable Sentencing Guidelines range based on Brooks' "good faith." The district court declined. In response to counsel's question whether the district court believed it lacked authority to depart, the court stated: "[T]here's always authority, but the authorities that exist don't allow me to do so as I see the circumstances of this case."
 
 
 8
 Here, as in United States v. Belden, 957 F.2d 671, 676 (9th Cir.), cert. denied, 113 S. Ct. 234 (1992), "the district court's decision not to depart did not appear to rest on the judge's belief that departure was prevented as a matter of law." Such discretionary sentencing decisions are unreviewable on appeal. See id.
 
 VII
 
 9
 Brooks argues that the district court erred in ordering him to pay $624,000 in restitution pursuant to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. Secs. 3663-64, without making a determination of his ability to pay.
 
 
 10
 This court has held that section 3664(a) of the VWPA does not require the district court to make findings of fact. United States v. Cannizzaro, 871 F.2d 809, 811 (9th Cir.), cert. denied, 493 U.S. 895 (1989). However, "the record must nonetheless reflect that the district judge had at his disposal information bearing on the considerations enumerated in section 3664." Id. Here, the district court had such information at its disposal in the presentence report ("PSR"). The PSR, in addition to containing a section entitled "Financial Condition: Ability to Pay," set forth information concerning Brooks' education, vocational skills, and employment history. This type of information is sufficient for the district court to satisfy its duties under section 3664(a). See id. at 812.
 
 VIII
 
 11
 Ireland claims the district court's jury instruction on the materiality element of securities fraud was erroneous because it failed to instruct the jury that a material fact had to be an "important" fact. The district court instructed the jury that a "material" omission is one that "would be the type of fact that would affect the investment decision of a reasonable person."
 
 
 12
 The Ninth Circuit model jury instruction defines a material omission as one "which relates to something important to the purchase or sale." Manual of Model Criminal Jury Instructions for the Ninth Circuit Sec. 9.02 (1992); see also Toombs v. Leone, 777 F.2d 465, 469 (9th Cir. 1985). We need not delve into the minimal differences between the two instructions, however, because the materiality of the omissions in this case was sufficiently clear to render any semantic distinction in the instruction harmless. See United States v. Halbert, 640 F.2d 1000, 1008 (9th Cir. 1981). Among other things, the defendants included handpicked mineral assays in the materials sent to investors stating that the mine yielded an average of 0.8 ounces of gold per ton of ore and omitted Dr. Johnson's report that the true yield was closer to .002 ounces per ton. Clearly, this was a material omission.
 
 IX
 
 13
 Ireland claims there was insufficient evidence to support his conviction on the securities fraud, wire fraud, and conspiracy counts. As to the securities and wire fraud counts, Ireland claims there was insufficient evidence to show that he possessed the intent to defraud which is an element of both crimes.
 
 
 14
 As with Brooks, the evidence of Ireland's intent was straightforward. Among other things, Ireland was aware that Dr. Johnson's final report stated that Brooks lacked a permit to operate the mine, that the assays used by Brooks were handpicked and did not represent the true quality of the ore, and that the ore actually had less than .002 ounces of gold per ton. Ireland neither disclosed this information to investors nor corrected the information in the prospectus and mineral assays that represented otherwise. Indeed, Ireland continued to promote Gold Hill '88, raising one million dollars more from investors after he was in possession of Dr. Johnson's final report.
 
 
 15
 The evidence of a conspiracy was also straightforward. The agreement element of the crime of conspiracy can be inferred "if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." United States v. Monroe, 552 F.2d 860, 862-63 (9th Cir.), cert. denied, 431 U.S. 972 (1977). The fact that Brooks and Ireland continued to work together in the sale of 300 more units in Gold Hill '88 after both were aware of Dr. Johnson's report could lead to an inference that an agreement existed to defraud the investors.
 
 X
 
 16
 Ireland argues that the district court erred in refusing to depart downward from the applicable Sentencing Guidelines range based on Ireland's argument that "the government's case against him was marginal at best." Ireland cites no case, and we can find none, in which the "marginality" or "closeness" of the government's case has been used as a grounds for a downward departure. Ireland's Rule 29 motion for judgment of acquittal was denied by the district court, and the jury convicted him on all counts. He has pointed to no special circumstance, other than an alleged weakness of evidence, that would justify a departure under section 5K2.0 of the Guidelines.
 
 XI
 
 17
 For the above reasons, both Brooks' and Ireland's convictions, as well as their sentences, are affirmed. Brooks' restitution order is also affirmed.
 
 
 18
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed. R. App. P. 34(a), Ninth Circuit R. 34-4
 
 
 **
 The Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation
 
 
 ***
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit R. 36-3
 
 
 [1]
 Brooks and Ireland rely on this court's decision in SEC v. Belmont Reid & Co., 794 F.2d 1388 (9th Cir. 1986), in which we held that certain gold coin sales did not meet the third prong of the Howey test, because the investors were not relying on the managerial efforts of the sellers. The sellers, as in a typical sale-of-goods contract, simply had to deliver the coins on a specified date: the profitability of the investment was up to the gold market. In R.G. Reynolds, 952 F.2d at 1135, we explained that Belmont Reid "was based on the unique fact that those contracts were made during a period when the value of gold was appreciating rapidly." By contrast, investors in Gold Hill '88 were not depending on an increase in the market price of gold. The prospectus represented that the units would be profitable even if the current market price for gold dropped by almost half. To realize this profit, investors were dependent on Brooks' success in setting up a concentration plant and processing the ore